Rene L. Valladares
Federal Public Defender
Nevada Bar No. 11479
Katherine Tanaka
California Bar No. 314082
Katherine_Tanaka@fd.org
Kevin Tate
Nevada Bar No. 8687
Kevin_Tate@fd.org
Assistant Federal Public Defenders
411 E. Bonneville Ave.
Las Vegas, NV 89101
(702) 388-6577

Counsel for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA,
Plaintiff,

v.

WILLIAM JAMES O'DONNELL,
Defendant.

Case No: 3:26-cr-00034-JAM

**MOTION IN LIMINE TO EXCLUDE EVIDENCE AND TESTIMONY REGARDING THE DEATH AND OVERDOSES**

Defendant William O'Donnell, through counsel, moves this Court to exclude all evidence referencing Adult 1's death and Adult 2 and Adult 3's overdoses.[1] The

[1] Mr. O'Donnell is filing the instant motion in limine before the motion in limine deadline, and two weeks before trial, because the issues addressed here are

government has charged Mr. O'Donnell with one count of distribution of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(C). ECF No. 71. The government is *not* pursuing the sentencing enhancement for distribution resulting in death and/or serious bodily injury. Thus, any evidence referencing the death and overdoses that occurred on December 15, 2024, are substantially more prejudicial than probative and risks the jury being unfairly influenced by an emotional response when considering the evidence at trial.

The defense anticipates the government will argue Adults 1, 2, and 3 all consumed drugs on December 15 and will seek to introduce evidence of what drugs were found in their systems. This evidence only becomes relevant if the government specifically alleges that the drugs in their systems were the drugs distributed by Mr. O'Donnell. To the extent the government makes that allegation at trial, the defense will stipulate to the following facts:

1. In the early hours of December 15, 2024, Adult 1, Adult 2, and Adult 3 ingested drugs.

2. Toxicology screens for Adult 1, Adult 2, and Adult 3 revealed positive results for the presence of: (a) cocaine and fentanyl in Adult 1; (b) cocaine, fentanyl, and cannabinoids in Adult 2; and (c) cocaine, fentanyl, and methamphetamine in Adult 3.

---

both slightly more complicated and inextricably intertwined with Mr. O'Donnell's motions to strike government experts, which will be subsequently filed. Mr. O'Donnell anticipates filing additional motions in limine by the October 2, 2026 deadline set by this Court.

In precluding any evidence related to the death or overdose, Mr. O'Donnell respectfully requests this Court exclude testimony from the following four witnesses: (1) Dr. Nicole Stanley, Oregon State Police Medical Examiner; (2) Crystal Hart, Forensic Scientist, Department of State Police Forensic Laboratory; (3) Tyler Dickerson, Paramedic, Clackamas Fire District #1; (4) Julie Ford, Adult 1's Mother, and (5) Ronald West, the third overdose victim. Additionally, Mr. O'Donnell requests this Court exclude any evidence related to the 911 call and medical treatment from the paramedics and the hospital.

As this Motion is being filed before the government's deadline to file its exhibit and witness lists, Mr. O'Donnell reserves the right to add or supplement this list once the government files its trial documents on October 6, 2026.

## I. FACTUAL BACKGROUND

Mr. O'Donnell is accused of distributing fentanyl at his home on December 15, 2024. The defense anticipates the government will attempt to prove distribution by introducing evidence that Adult 1 and Adult 2 arrived at Mr. O'Donnell's house that evening with the goal of obtaining cocaine. According to the government's theory, Mr. O'Donnell provided Adult 1 drugs, purported to be cocaine, packaged in a piece of tin foil. After obtaining the purported cocaine, Adult 1 and Adult 2 drove back to Adult 1's apartment. Adult 3 subsequently arrived at Adult 1's apartment after Adult 1 and Adult 2 returned with the purported cocaine. According to the

government's theory, Adult 1, Adult 2, and Adult 3 ingested the purported cocaine received from Mr. O'Donnell and fell unconscious.

Adult 1's mother, Julie Ford, found the three adults unconscious in Adult 1's bedroom and called 911. She attempted to administer CPR to Adult 1. Paramedics arrived around 3:45 a.m. and revived Adult 2 and Adult 3 after administering Narcan. Paramedics also provided Adult 1 with Narcan, but Adult 1 died at the hospital around 5:30 a.m. Testing done at the hospital for all three adults revealed the presence of cocaine and fentanyl, among other drugs, in their systems. Adult 1 and Adult 3's daughters, both approximately eight years old at the time, were present in the apartment that evening.

On February 18, 2026, the government indicted Mr. O'Donnell with one count of Distribution of Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(C). ECF No. 71. The government alleged Mr. O'Donnell knowingly and intentionally distributed a mixture and substance containing a detectable amount of fentanyl. *Id.* To convict Mr. O'Donnell of this charge, the jury will need to find beyond a reasonable doubt that Mr. O'Donnell "knowingly distributed fentanyl" and "knew that it was fentanyl or some other federally controlled substance."[2] Distribution is

[2] Ninth Circuit Model Criminal Jury Instruction 12.4 Controlled Substance—Distribution.

defined as "delivering or transferring possession of fentanyl to another person, with or without any financial interest in that transaction."[3]

## II. LEGAL AUTHORITY

Under Fed. R. Evid. 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Relevance is not, however, conclusive of admissibility. Even if relevant, evidence should be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 (advisory Committee Notes); accord *United States v. Ellis*, 147 F.3d 1131, 1135 (9th Cir. 1998).

Under Rule 403, evidence may be excluded if "it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Pineda-Doval*, 614 F.3d 1019, 1035 (2010) (quoting *United States v. Yazzie*, 59 F.3d 807, 811 (9th Cir. 1995) (cleaned up)). "To determine whether the prejudicial nature of a

---

[3] *Id.*

specific piece of evidence outweighs its probative value, a district court should consider whether the government could have made the same showing through less prejudicial means." *United States v. Higuera-Llamos*, 574 F.3d 1206, 1209 (9th Cir. 2009).

As the Supreme Court observed in *Old Chief v. United States*, 519 U.S. 172 (1997), "what counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." *Old Chief*, 519 U.S. at 184. Indeed, "[t]he Committee Notes to Rule 401 explicitly say that a party's concession is pertinent to the court's discretion to exclude evidence on the point conceded." *Id.*; Advisory Committee's Notes on Fed. Rule Evid. 401 (noting there will situations "which call for the exclusion of evidence offered to prove a point conceded by the opponent"). Additionally, the Committee Notes to Rule 403 "take up the point by stating that when a court considers 'whether to exclude on grounds of unfair prejudice,' the 'availability of other means of proof may . . . be an appropriate factor.'" *Old Chief*, 519 U.S. at 184 (quoting Advisory Committee's Notes on Fed. Rule Evid. 403).

"Thus[,] the notes leave no question that when Rule 403 confers discretion by providing that evidence 'may' be excluded, the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives." *Id.* at 184–85 (citing 22 C. Wright & K. Graham, Federal Practice and

Procedure § 5250, pp. 546–547 (1978) ("The probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point")).

## III. ARGUMENT

Evidence of Adult 1's death and Adult 2 and Adult 3's overdoses have little or no probative value and are highly prejudicial because testimony about the death and overdoses will inevitably provoke a strong emotional response from the jury.

*First*, this evidence has no probative value. The fact that Adults 1, 2, and 3 consumed drugs on December 15, 2024, is not in dispute. The relevant question for the jury is whether Mr. O'Donnell distributed drugs on or about that day and, if so, what drugs he distributed. The overdoses, and death, have no bearing on the jury's only inquiry.

*Second*, and most critically, evidence of overdose and death is categorically the most prejudicial evidence available. The Ninth Circuit has recognized that "evidence may be particularly prejudicial where it connects a party with a highly charged public issue, such as narcotics." *United States v. Blackstone*, 56 F.3d 1143, 1146 (9th Cir. 1995) (cleaned up). Drug use, especially drug use involving fentanyl, is an incendiary topic in the state of Oregon. "Fentanyl is a nationwide problem, but

perhaps it's nowhere more visible than in Oregon[.]"[4] According to the Centers for Disease Control and Prevention data, "Oregon had the highest percentage of increase of deadly overdoses in the country from 2022 to 2023."[5] In 2024, when the fentanyl crisis became so overwhelming, Oregon's elected officials "declare[d] a 90-day state of emergency in downtown Portland, funneling resources into fighting the city's deadly fentanyl crisis."[6]

The problem is not just confined to the city, or to those who personally know or have experience with drug addiction. Drug use, and specifically fentanyl, affects every family. For example, in Beaverton, Oregon, just 15 minutes outside of Portland, "[e]very middle, high and option school student . . . receives a yearly fentanyl-specific lesson as part of their advisory or health class."[7] Within the Beaverton School district, all "secondary schools are stocked with Naloxone"

---

[4] Kyle Almond, *This is what the fentanyl crisis looks like in a state rethinking its historic drug policy*, CNN (Mar. 2, 2024) https://www.cnn.com/interactive/2024/03/us/oregon-drug-crisis-cnnphotos/.

[5] Emily Girsch, *Oregon ranks highest in fentanyl overdose increases nationwide, CDC data shows*, NBC 16 (Feb. 19, 2024, 7:03 PM) https://nbc16.com/newsletter-daily/cdc-data-shows-oregon-ranks-highest-in-fentanyl-overdose-increases-nationwide.

[6] Amy Simonson, Lauren Mascarenhas *Oregon leaders declare 90-day state of emergency in downtown Portland to address fentanyl crisis*, CNN (Jan. 31, 2024) https://www.cnn.com/2024/01/31/us/fentanyl-crisis-portland-state-of-emergency/index.html.

[7] *Fentanyl Awareness*, Beaverton School District (last visited Sep. 28, 2026) https://www.beaverton.k12.or.us/departments/communications-community-involvement/fake-and-fatal.

(Narcan).[8] Allegations of drug use and distribution, especially use and distribution of fentanyl, is a particularly charged subject in Oregon, and especially in the surrounding area where this case is being tried.

The specific facts of the overdoses and death here would compound the prejudice. The decedent in this case was 28 years old at the time of her death. She left behind an eight-year-old daughter who was in the apartment on the night of the overdose. Adult 2 and Adult 3 lost a close friend and suffered nearly fatal overdoses that required multiple days of recovery in the hospital. The facts of this case present a high risk the jury will convict Mr. O'Donnell, not based on a neutral and fair view of the evidence specific to the offense, but on an emotional reaction to the highly charged circumstances. *See Old Chief*, 519 U.S. at 180 ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").

*Third,* allowing evidence of the death and overdoses would also handicap Mr. O'Donnell's defense. The jury would wrongfully conclude that Mr. O'Donnell distributed the drugs that caused the overdoses and death without requiring the government to prove causation, or allowing the defense to defeat causation. There is a serious risk that allowing evidence of the death and overdoses would create an

---

[8] *Id.*

implication that Mr. O'Donnell distributed the drugs that caused the death and the overdoses, a conclusion the defense contends the government could never prove without testing the medical evidence through the trial process.[9]

Moreover, allowing the death and overdoses to come into evidence runs a serious risk of creating a trial within a trial on an uncharged issue. Faced with testimony from a medical examiner, forensic toxicologist, and paramedic will inevitably cause the jury to question whether the drugs the three adults ingested were drugs obtained from the O'Donnell residence and focus on whether those drugs caused a death and two overdoses.

While the government intends to use the fact of the death and the overdoses to establish that the drugs the adults ingested after returning to Adult 1's apartment contained fentanyl, as discussed below, the fact of the death and overdoses themselves have no relevance and can be established through substantially less prejudicial means. Mr. O'Donnell is willing to stipulate that (1) in

---

[9] Notably, there was a serious question as to whether the drugs the three adults received from the O'Donnell residence caused the death and overdoses. As noted by Dr. Stanley, the cause of Adult 1's death was mixed toxicity, fentanyl and cocaine. Adult 2 and Adult 3 similarly had multiple drugs in their system. Adult 1 also had very serious health issues that would have been explored by a defense expert as to the impact on Adult 1's cause of death. All of these issues would have been explored had the jury needed to determine whether the drugs obtained from the O'Donnell residence caused the death and overdoses. It is substantially prejudicial to permit the government to create an implication the drugs obtained at the O'Donnell residence cause a death and two overdoses without giving the defense the opportunity to rebut it.

the early hours of December 15, 2024, Adult 1, Adult 2, and Adult 3 ingested drugs; and (2) toxicology screens for Adult 1, Adult 2, and Adult 3 revealed positive results for the presence of: (a) cocaine and fentanyl in Adult 1; (b) cocaine, fentanyl, and cannabinoids in Adult 2; and (c) cocaine, fentanyl, and methamphetamine in Adult 3. These stipulations allow both sides to cleanly present their case in chief without risking a jury verdict improperly based on emotion.

Exclusion of the death and overdoses will keep the jurors focused on the questions they have been asked to answer and avoid confusing and distracting them with the emotion of an uncharged tragedy. It will avoid having a grieving mother testify on the stand. And it will prevent the defense from probing into the fact that Adult 1's own father declined to go to his daughter's apartment despite Ms. Ford calling and telling him that he needed to come over because their daughter had overdosed and was not doing well.

Exclusion of the death and overdoses will also result in a more efficient and streamlined trial that does not require testimony from four different expert witnesses for the government's case in chief. It will also avoid any confusion over the issue of causation or the risk creating a trial within a trial where the jury is focused on whether the drugs obtained from the O'Donnell residence caused a death and two overdoses.

/ / /

/ / /

### A. Testimony regarding Adult 1's death is substantially more prejudicial than probative.

The fact of Adult 1's death has no relevance to the question before the jury – whether Mr. O'Donnell distributed fentanyl. Thus, the government's proposed experts' testimony has no evidentiary value beyond the limited relevance of the toxicology results, which as discussed above, the defense has no objection to stipulating to those facts, as covered by the proposed stipulations.

With respect to Adult 1's death, the government intends to call Dr. Stanley, the medical examiner who conducted Adult 1's forensic examination, and Ms. Hart, the Forensic Scientist who analyzed Adult 1's blood and urine. Dr. Stanley will testify that Adult 1 "did, in fact, ingest fentanyl and cocaine, on the evening she passed away." ECF No. 106 at 2. Ms. Hart will testify that Adult 1 had both fentanyl and a cocaine metabolite in her system at the time of her death. *Id.* at 6. These conclusions by both Dr. Stanley and Ms. Hart, which simply confirm Adult 1 had cocaine and fentanyl in her system shortly before her death, are covered by the proposed stipulations. Dr. Stanley and Ms. Hart's testimony fails to provide any additional evidentiary value that is not already covered by the proposed stipulations, aside from allowing the government to inform the jury of the fact of Adult 1's death.[10]

---

[10] Mr. O'Donnell will be filing a separate motion to strike Dr. Stanely and Ms. Hart as expert witnesses.

Additionally, Dr. Stanley and Ms. Hart's testimony cannot provide the causal link the government is attempting to backdoor through their testimony. Although the government argues "[t]he fact that fentanyl was found in the body of the deceased and contributed to her death make it more likely that in fact what the defendant provided to Adult Victim 1 was fentanyl, for which he is charged," they cannot opine to this connection. Neither Dr. Stanely nor Ms. Hart have any personal knowledge about the drugs Adult 1 ingested, the timing of when Adult 1 ingested drugs, or who Adult 1 may have received drugs from that evening.

The fact of Adult 1's death has no relevance to the question before the jury – whether Mr. O'Donnell distributed fentanyl—but the risk of an adverse effect on the jury, is high. If Adult 1's death is allowed to come into evidence, the jury is inevitably going to hear from a grieving mother who will testify about the traumatic experience of finding her daughter unconscious and having to administer CPR. The jury will also inevitably hear testimony from two grieving friends, Adult 2 and Adult 3, who not only experienced their own trauma, but also suffered the loss of their close friend.

There is a substantial risk that a conviction in this case will be "more likely" because evidence of Adult 1's death will "provoke[] an emotional response in the jury . . . toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *Pineda-Doval*, 614 F.3d at 1035. Accordingly, this Court should exclude any evidence about Adult 1's death because evidence of the

death is substantially more prejudicial than probative to the jury's ultimate question—whether Mr. O'Donnell knowingly distributed fentanyl on December 15, 2024.

**B. Testimony regarding Adult 2 and Adult 3's overdoses are substantially more prejudicial than probative.**

Evidence regarding Adult 2 and Adult 3's overdoses should also be excluded under Rule 403 as more prejudicial than probative. Any testimony the government intends to elicit through discussion of the overdoses has no evidentiary value and is ultimately covered by the proposed stipulated facts. For example, the government intends to call Mr. Dickerson, a paramedic who responded to Adult 1's apartment on the evening of the overdoses.[11] Mr. Dickerson will testify that "Narcan was administered to [Adult 2 and Adult 3] and both responded positively to it." ECF No. 106 at 14. According to the government, this testimony is relevant because this "positive response indicates that an opioid or synthetic opioid (such as fentanyl) was involved in causing the overdose." *Id.* But again, the proposed stipulations cover this fact. There is no dispute Adult 2 and Adult 3 had fentanyl in their systems.

The lifesaving measures done by the paramedics are not relevant to determining whether Mr. O'Donnell knowingly distributed fentanyl. Like Dr. Stanley and Ms. Hart's testimony, Mr. Dickerson's testimony fails to provide any

---

[11] Mr. O'Donnell will be filing a separate motion to strike Mr. Dickerson as an expert witness.

additional evidentiary value that is not already covered by the proposed stipulations. Thus, the evidentiary value of the overdoses is low and only risk prejudicing the jury.

For similar reasons, any testimony from Ms. Ford—including testimony about finding the three adults unconscious and calling 911—is not relevant to whether Mr. O'Donnell distributed fentanyl that evening, and this testimony risks prejudicing the jury. Requiring Ms. Ford to re-live, in front of the jury, the trauma of finding her daughter and friends unconscious and attempting CPR on her daughter will inevitably cause an emotional response from the jury. Similarly, the 911 call that captures the panic and seriousness of the situation that evening will also likely trigger a negative emotional response. The prejudice of this emotional response substantially outweighs the probative value of the evidence considering the question the jury must decide—whether Mr. O'Donnell intentionally distributed fentanyl—and the facts provided in the proposed stipulation.

In light of the proposed stipulations and the risk of having a grieving mother testify on the stand, this Court should exclude Ms. Ford's testimony entirely as substantially more prejudicial than probative. Ms. Ford was not at the O'Donnell residence that evening. She does not know Mr. O'Donnell, nor has she ever spoken to him. Thus, Ms. Ford has no personal knowledge that is relevant to whether Mr. O'Donnell intentionally distributed fentanyl that evening. Additionally, Ms. Ford was not in Adult 1's apartment the entire evening. In fact, she was out of the

apartment for a period of time after Adult 1 and Adult 2 returned from Mr. O'Donnell's residence. Thus, to the extent the government argues Ms. Ford's testimony is relevant to address what happened after Adult 1 and Adult 2 returned to Adult 1's apartment, her testimony has a low probative value and is unnecessarily cumulative in light of Adult 2's presence the entire evening. *See* Fed. R. Evid. 403.

For similar reasons, this Court should also exclude any testimony of Adult 3. Adult 3 almost died of an overdose while his eight-year-old daughter was in the next room. The trauma of that experience is inevitably going to make any testimony Adult 3 provides highly emotional. And his testimony holds no or minimal probative value. Adult 3 was not at the O'Donnell residence that evening. Rather, Adult 3 came to Adult 1's apartment, after Adult 1 and Adult 2 returned from Mr. O'Donnell's residence. Thus, like Ms. Ford, Adult 3 has no personal knowledge regarding whether Mr. O'Donnell intentionally distributed fentanyl, and any testimony he could provide is unnecessarily cumulative in light of Adult 2's testimony. Even if this Court precludes any testimony regarding the overdose, there is a substantial risk the jury will read into any emotion from Ms. Ford and Adult 3, unfairly prejudicing the jury and confusing the issues. *See* Fed. R. Evid. 403.

To the extent the government argues it cannot put on its case in chief without discussing evidence of the overdose, this argument is untenable. Adult 2 will still be able to testify to all the events that took place that evening; she simply will not be

able to testify to anything beyond ingesting the purported cocaine. Precluding any evidence of the death or overdose does not prevent the government from eliciting testimony about what happened at Mr. O'Donnell's residence and anything else that occurred between the time Adult 1 and Adult 2 left Mr. O'Donnell's residence and ingested the drugs.

This is not a case where excluding the death or overdoses would result in a "break in the natural sequence of narrative evidence." *Old Chief*, 519 U.S. at 189 ("A convincing tale can be told with economy, but when economy becomes a break in the natural sequence of narrative evidence, an assurance that the missing link is really there is never more than second best."). Rather, the government will be able to present an unbroken narrative from the start of Adult 1 and Adult 2's evening, up until the moment the three adults ingested the drugs allegedly received from Mr. O'Donnell's residence.

Lastly, to the extent the government argues that the death can be excluded, but the overdoses must come in, this is also not a tenable proposal. While excluding any evidence of the overdoses is justified under Rule 403 for all the reasons discussed above, there are also reasons this Court should exclude the overdoses if this Court determines the death should be excluded as unfairly prejudicial. If Adult 2, Adult 3, and Ms. Ford are permitted to testify about the events of that evening, the jury is inevitably going to wonder why Adult 1 is not present and testifying. Adult 1's absence, particularly in light of the emotional testimony from Adult 2 and

Ms. Ford, risks prejudicing the jury and confusing the issue from: did Mr. O'Donnell knowingly distribute fentanyl? To: did Mr. O'Donnell cause a fatal overdose?

Ultimately, the risk of allowing testimony about the overdoses presents a high risk of unfairly prejudicing the jury, increasing the likelihood they will convict based on an emotional response to the tragedy of that evening. The question before the jury in this case is straightforward: did Mr. O'Donnell knowingly distribute fentanyl? The prejudice of an overdose is high, and the evidentiary value is low in light of the ultimate question the jury must decide, the proposed stipulations, and the fact that Adult 2, who was present for the entire evening, will be able to offer any contextual evidence the government needs to present in its case in chief. Thus, this Court should exclude any evidence and testimony regarding the overdoses from that evening.

## IV. CONCLUSION

Assuming a jury finds Mr. O'Donnell guilty, the government will be able to argue the fact of the death and overdoses to the Court at sentencing. Sentencing is the appropriate time for this Court to consider the emotional toll and consequences caused by the alleged fentanyl distribution. The emotions caused by a young woman dying and two other young people almost losing their lives is not at all relevant to the jury's consideration of whether Mr. O'Donnell distributed fentanyl under the particular circumstances of this case.

Accordingly, Mr. O'Donnell respectfully requests this Court grant the instant Motion and preclude all evidence and testimony related to the death and overdoses in this case. Should this Court grant any part of this motion thereby precluding evidence of the death and/or overdoses, Mr. O'Donnell respectfully requests this Court instruct the government to properly advise its witnesses to avoid accidental disclosure of facts that have been precluded from the jury.

Dated: September 29, 2026.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/Katherine Tanaka*
Katherine Tanaka, CA Bar # 314082
Assistant Federal Public Defender

*/s/Kevin Tate*
Kevin Tate, NV Bar # 8687
Assistant Federal Public Defender